Memorandum of Decision
On March 5, 1999, the Department of Children and Families (DCF) CT Page 2948 filed petitions to terminate the parental rights of Anthony R. and Fayita W. to their minor children, Takeyma R. and Tommisha R. The mother, Fayita W., consented to termination on January 4, 2000. On January 7, 2000, the father, Anthony R., filed a motion to revoke the commitment of the children to DCF. A consolidated trial of the termination petition and the motion to revoke took place on March 6, 2000. For the reasons stated below, the court now grants the termination petitions in their entirety and denies the motion to revoke as moot.
 FACTS
The court finds the following facts and credits the following evidence. Anthony R. was thirty-five years old at the time of trial. As a child, Anthony was hospitalized on one occasion for psychiatric reasons. He began using marijuana and beer as a teenager and then switched to cocaine and heroin. He withdrew from high school in the eleventh grade. In 1981, he was convicted of robbery and sentenced to prison. Since that time, Anthony R. has spent more time in prison than in the community, amassing a total of nine felony and six misdemeanor convictions.
At some point the father developed a nonmarital relationship with Fayita W. Through this relationship, Takeyma R. was born on November 17, 1992. Takeyma was addicted to heroin at birth. In her early years, Takeyma was raised primarily by her maternal great-grandmother. The father was not a custodial parent and was not involved in Takeyma's life. On July 30, 1995, Fayita gave birth to Tommisha. At about that time, the father went to jail and was ultimately sentenced to a term of five years for possession and sale of narcotics and two counts of assault on a police officer.
The father did not see his children for the next two years. On September 2, 1997, DCF obtained an order of temporary custody of the children and filed neglect petitions after a police raid revealed that the maternal great-grandmother's residence was a drug house and in deplorable physical condition. DCF offered the father monthly visitation and, on September 26, 1997, the first visit took place. The children did not recognize their father at this visit.
In December, 1997, DCF placed the children with their paternal aunt and uncle. The paternal aunt, Nellie B., continued the practice of monthly visitation by bringing the children to prison CT Page 2949 on her own. The children progressed steadily in the home of their aunt and uncle, who gave them a great deal of time and attention.
The father sent the children Christmas presents in 1997 but not in subsequent years. He did not send any birthday cards or presents. The father called the children at the paternal aunt's house a few times during this time period. He called DCF a total of five times, primarily to ask about placement decisions and court schedules rather than inquire directly about the children's welfare. His visits with the children went well, and the children grew to recognize him and call him "daddy." The children, however, did not ask for him between visits and the father did not ask for more frequent visits.
The father received three disciplinary tickets during his most recent prison stay. In 1998, he participated, at the prison's request, in a two month substance abuse relapse prevention program. Beginning in November, 1998, the father volunteered for a family reunification program conducted in prison by Community Partners in Action. The father successfully completed the ten month program and remained in it through his release from prison on March 6, 2000.[2] The program insures that the father will have a job upon his release.
In the spring, 1999, the paternal aunt and uncle decided that they were not able, due to their health and age, to serve as a permanent resource for the children. The father suggested placement with his cousins Rosalind and Eric H. in Georgia. From June to October, 1999, the father called DCF regularly to inquire whether DCF had placed the girls with the H. family. On December 28, 1999, after the completion of an interstate study, DCF transferred the girls to their new placement in Georgia.
Once the transfer took place, the father made numerous collect phone calls to the girls in Georgia. The father would tell the girls that he would come for them as soon as he was released from prison. This message upset the girls. Because of the number and content of these phone calls, the H. family decided that they would no longer accept them. The new foster parents did allow the father to write the children. The father did so, but the letters contained a similar message that the father intended to raise the girls upon his release.
The girls have stated that they are happy at the new foster home and that they do not wish to live with their natural father. CT Page 2950 They call Rosalind "Mama" and Eric "Uncle Eric." Both girls have joined a cheerleading group. At the same time, they have presented some disciplinary problems. Tommisha in particular has behaved poorly in preschool and both girls have recently exhibited some sexualized behaviors. The new foster parents may put the girls in counseling.
The new foster parents are interested in providing a home for the girls for the remainder of their childhood. They have stated that they are willing to adopt Takeyma and Tommisha. Most recently, Eric H. has told DCF that he has no strong preference for adoption over transfer of guardianship, while Rosalind H. has stated that she would prefer transfer of guardianship to adoption because of her loyalty to the family. Although DCF's current plan is for adoption by the H. family, it needs until the fall of 2000 to complete its supervision of this placement before it can formally file papers and commit itself to this adoption plan.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112 (c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112 (c)(1). In this case, the court found, on February 25, 1999, at a hearing concerning the permanency plan, that reasonable efforts to reunify the children with the parents were no longer appropriate. Accordingly, the initial element in the termination statute has been satisfied.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes CT Page 2951 § 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no amendments to the termination petition concerning the father, the adjudicatory date for him is March 5, 1999, the date of the petition's filing.[3] The petition alleges the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against him. The court finds that DCF has proven all three grounds by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of the child." In re Migdalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
The father completely abandoned his two children from the latter part of 1995 to the latter part of 1997. Although the father was incarcerated during this time period, incarceration alone is not a complete defense to abandonment, See In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 443,446 A.2d 808 (1982). An incarcerated parent is expected to "make use of available though limited resources for contact with a distant child." Id. The father in this case did not. As a result of the father's failure to see his children during this time period, the children did not recognize him when they visited in September, 1997. Between that visit and the end of the adjudicatory period, the father saw his children monthly, sent them Christmas presents in 1997, and communicated sporadically with DCF and the foster family. On the other hand, the father did not request more frequent visits, did not maintain regular correspondence with his CT Page 2952 children, and did not inquire regularly about their well-being. For these reasons, and because the father completely abandoned the children during his first two years of incarceration, the court finds that DCF has proven the ground of abandonment by clear and convincing evidence.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). No dispute exists that, on January 29, 1998, the court adjudicated the children to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time.'" In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert.denied, 193 Conn. 802, 474 A.2d 1259 (1984).
As of the adjudicatory date of March 5, 1999, the father in this case was not in a position "within a reasonable time. . . [to] assume a responsible position in the life of the child[ren]." General Statutes § 17a-112 (c)(3)(B)(1). The principal reason, of course, was that he had at least nine months more to serve of his five year prison sentence. In addition, he CT Page 2953 had little relationship with the children. Further, while his performance in the prison's family reunification program revealed some potential, the father had no history of living a responsible, substance-free and productive life as an adult in the outside world. Accordingly, the evidence clearly and convincingly shows that the father failed to rehabilitate during the adjudicatory period.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
In the present case, the father had no relationship with his children at all during his first two years of his most recent incarceration. The children did not recognize their father at the first prison visit in September, 1997. It is true that over the next eighteen months the children established at least a visiting relationship with their father and the visits went well. Those facts do not negate the reality that, for a significant period of time during the adjudicatory period, there was a complete absence of a father-child relationship with Takeyma and Tommisha. Accordingly, DCF has proven this ground by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." CT Page 2954 General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Takeyma and Tommisha favor termination of their father's parental frights. The father's ability to serve as a care taker for these girls is doubtful. Although he has shown potential through his participation in the Community Partners in Action program, and he has shown more interest in his daughters of late, he has no track record of stability outside of prison. It will undoubtedly take several years to determine whether the father has completely forsaken his prior life of crime and drugs. Needless to say, his daughters cannot wait that long for permanency.
The father seems to recognize this fact. He presses the alternative argument that the best resolution of this case is transfer of guardianship to the H. family without terminating his parental rights. In that way, according to the father, he can be available as a resource if the H. family does not wish to continue guardianship of the two girls.
There are several responses to this proposal. First, the H. family has stated that it is willing to adopt, although it is not clear whether currently it is their first choice. Given that the natural mother has consented to termination, terminating the father's parental rights would legally free both girls for adoption. Elimination of this legal risk might enhance the willingness of the H. family to commit themselves to adoption, thus giving the girls a permanent home.
Second, a guardianship, unlike adoption, is revocable. See General Statutes § 45a-613. Its revocable nature leads to the possibility that the father would bring or threaten further legal proceedings, thus interfering with the stability and permanency that these girls are entitled to have. The father has already demonstrated his ability to upset the girls by repeatedly calling the foster home and promising that he would come for them upon his release from prison. He may do so again unless he loses his legal standing to do so.
The father adds that, given the lack of certainty about whether the H. family will adopt the girls, he should remain available as a resource. Although it is certainly possible that the H. family may not adopt and may wish to transfer placement of the girls at CT Page 2955 some future time, the prospects of the father's full recovery to the position of stable care taker are sufficiently slim that this court should not rest its decision on them. Of no small importance is the fact that the girls have stated that they do not wish to live with their father.
This case is somewhat different from other termination cases because neither DCF nor the foster parents have fully committed themselves to adoption. There is obviously no certainty about the future position of these parties or, for that matter, of the father or the girls. This court must make a decision based on what is likely rather than what is certain. Under the facts of this case as they stand now, the most likely — and desirable — outcome is adoption by the H. family. This court finds that the best interest of the girls favors termination of the father's rights in order to maximize this likelihood. Perhaps the H. family can accommodate the father's interest in maintaining a relationship with the girls by permitting some form of contact or visitation. In general, this court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407, 415,551 A.2d 738 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P.,39 Conn. App. 353, 362, 664 A.2d 1168
(1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F.,250 Conn. 674, 691, 738 A.2d 141
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
DCF could not provide services other than visitation in this case because of the father's incarceration throughout the entire period of DCF's involvement.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child CT Page 2956 Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made reasonable efforts to reunite the father consistent with the fact that he was in prison for the length of DCF involvement and therefore was unable to benefit from counseling programs in the outside world.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On January 29, 1998, the court entered the following expectations for the father to meet to facilitate the return of the children to his custody: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF or your attorney, (3) visit the children as often as DCF permits, (4) participate in individual counseling, 5) secure and maintain adequate housing and income after release, 6) no substance abuse, 7) no involvement with the criminal justice system, and 8) parenting education after release from prison. The father complied with the expectations to the extent it was possible to do so from prison.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
The children have begun to develop an attachment to their relative foster parents. They had a visiting relationship with their father, but do not wish to live with him.
5) The age of the child.
Takeyma is seven years old. Tommisha is four years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the CT Page 2957 maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that father did not adjust his circumstances in time to make it in the children's best interest to return to their home. The fathers' criminal conduct has made him unavailable as a care taker. He did maintain regular visits with the children but, until recently, his contact with their care takers and with DCF was limited.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the father's difficulties stem primarily from his own lifestyle choices and not from unreasonable interference by the mother or any third person, or from economic circumstances.[4]
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petitions in their entirety. The father's motion to revoke the commitment is denied as moot. The court appoints the Commissioner of DCF as statutory parent for the children for the purpose of securing adoptive families. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court
[2] Ironically, the father was released from prison on the day of the trial in this case.
[3] DCF amended the petition on January 4, 2000 to allege the mother's consent, but that action should not affect the father's case.
CT Page 2958
[4] The record does not reflect that, at the time the court accepted the mother's consent to termination, the court made a finding, required by General Statutes § 17a-112 (b)(1), that termination of the mother's parental rights is in the best interest of the children. The record reveals that the mother has very little relationship with Takeyma and Tommisha and that she failed to complete programs designed to address her history of substance abuse, lack of parenting skills, and need for counseling. Given this court's decision to terminate the father's parental rights, termination of the mother's parental rights would free both children for adoption. Accordingly, the court finds that termination of the mother's parental rights is in the best interest of the children.